## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.   18-80122-CR-MIDDLEBROOKS/BRANNON(s)

18 U.S.C. § 1349
21 U.S.C. § 846
21 U.S.C. § 841(a)(1)
18 U.S.C. § 1512(c)
18 U.S.C. § 982
18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461(c)

UNITED STATES OF AMERICA

v.

ARMAN ABOVYAN and
TINA MARIE BARBUTO,

     Defendants.

_____/

FILED BY _SP_____ D.C.

AUG 2 8 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

### SUPERSEDING INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times material to this Superseding Indictment:

### The Treatment Centers

1.    Journey to Recovery LLC ("Journey") was located at 7451 S. Military Trail, Lake Worth, Florida, in Palm Beach County.   Journey purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction.

2.    Reflections Treatment Center, LLC ("Reflections") was located at 5100 Coconut Creek Parkway, Margate, Florida, in Broward County.   Reflections purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction.

3.      Although co-conspirator Kenneth Chatman owned and managed all aspects of Journey and Reflections (jointly referred to as "the Treatment Centers"), co-conspirator Laura Chatman was listed as the sole owner of the Treatment Centers on the corporate records filed with the State of Florida, and as the sole owner, Chief Executive Officer, and Chief Financial Officer of the Treatment Centers on the licensing documents filed with the Florida Department of Children and Families ("DCF").

### The Laboratories

4.      Co-conspirator Smart Lab LLC was a clinical laboratory located in the Southern District of Florida that performed urine testing for the Treatment Centers.

5.      Lab #2 was a laboratory located in the Northern District of Texas that performed urine and other testing for the Treatment Centers.

### The Pharmacies

6.      Pharmacy #1 was a national retail pharmacy with locations throughout the Southern District of Florida that filled prescriptions for patients of the Treatment Centers.

7.      Pharmacy #2 was a national retail pharmacy with locations throughout the Southern District of Florida that filled prescriptions for patients of the Treatment Centers.

### The Defendants

8.      Defendant **ARMAN ABOVYAN**, a licensed medical doctor in the State of Florida, was the Medical Director of Journey and Reflections from in or around July 2016 to in or around December 2016.   As medical director, defendant **ARMAN ABOVYAN** was responsible for evaluating patients, developing appropriate plans of treatment, and prescribing medically necessary treatment and testing.

2

9.      Defendant **TINA MARIE BARBUTO** served as the Assistant Clinical Director of Reflections from in or around December 2015 to in or around November 2016, and served as the Clinical Director of Reflections from in or around November 2016 to in or around December 2016. Defendant **TINA MARIE BARBUTO** was licensed by the State of Florida as a Licensed Mental Health Counselor.   As Clinical Director, defendant **TINA MARIE BARBUTO** was responsible for supervising clinical services, including regularly reviewing the work performed by subordinate employees.   Fla. Admin. Code § 65D-30.004(32).   "Clinical services" included screening, assessment, placement, treatment planning, counseling, and case management.   Fla. Admin. Code § 65D-30.002(12).   Defendant **TINA MARIE BARBUTO** was not a medical doctor and was not authorized to write prescriptions for medications, treatment, or laboratory testing or to provide statements regarding the purported medical necessity of medications, treatment, or laboratory testing.

**Federal Guidelines for Substance Abuse Treatment**

10.      The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA") was tasked with establishing and implementing a comprehensive program to improve the provision of treatment and related services to individuals with respect to substance abuse and with protecting the legal rights of individuals who are substance abusers.   42 U.S.C. § 290aa.

11.      "Substance abuse" is defined as "the abuse of alcohol or other drugs."   42 U.S.C. § 290cc-34(4).   "Treatment" means "the management and care of a patient suffering from alcohol or drug abuse, a condition which is identified as having been caused by that abuse, or both, in order to reduce or eliminate the adverse effects upon the patient."   42 C.F.R. § 2.11.

3

12.     In addition to substance abuse treatment programs, SAMHSA promulgated guidelines for sober homes.   Sober homes generally did not provide medical care or clinical services to their residents.   When properly managed, sober homes operated as alcohol and drug free living environments for individuals attempting to abstain from alcohol and drugs, including providing a peer support network of individuals in recovery.

13.     SAMHSA, in connection with the Drug Enforcement Administration ("DEA"), also regulated the use of prescription opioids to treat opioid addiction.   Buprenorphine, which was known by a number of brand names, including Suboxone, Subutex, and Zubsolv, was a Schedule III controlled substance, that is, it had a potential for abuse and, even when used as prescribed, could cause physical and psychological dependence.   When properly prescribed, buprenorphine could be used to treat individuals suffering from opioid addiction.

14.     Due to the potential for abuse and misuse among people who were already suffering from an addiction to opioids, SAMHSA and DEA put in place a licensing regimen, wherein licensed physicians who were already registered with the DEA to prescribe controlled substances could receive specialized training and apply for authorization to prescribe Buprenorphine to treat opioid addiction.   After meeting SAMHSA's requirements, applicants would receive a second registration from the DEA, known as a DEA "X-number," which allowed these physicians to lawfully prescribe Buprenorphine to treat opioid addiction in accordance with DEA, SAMHSA, and state prescribing requirements.

**Substance Abuse Treatment in Florida**

15.     Substance abuse services in Florida were governed by the "Hal S. Marchman Alcohol and Other Drug Services Act" ("the Marchman Act"), Fl. Stat. § 397.301.   Amongst other things, the Marchman Act made it unlawful for any person or agency to act as a substance

abuse service provider unless it was properly licensed.   Fl. Stat. § 397.401(1); Fl. Admin. Code § 65D-300.003(1)(a).   Under the Marchman Act, private substance abuse service providers' policies regarding payment for services had to comply with federal and state law.   Fl. Stat. § 397.431

16.     The Florida Department of Children and Families was tasked with regulating and licensing substance abuse service providers.   Fl. Stat. § 397.321.

17.     To insure the legitimacy of substance abuse service providers and to protect the health and welfare of patients, all substance abuse service provider personnel, including all owners, directors, and chief financial officers, had to pass a "level 2 background screening," including "fingerprinting for statewide criminal history records checks through the Department of Law Enforcement, and national criminal history records checks through the Federal Bureau of Investigation."   Fl. Stat. §§ 397.451(1)(a)(1), 435.04(1)(a).   Persons with qualifying felony convictions, including co-conspirator Kenneth Chatman, a/k/a "Kenny," were ineligible to own, operate, or serve as personnel at licensed substance abuse service providers, including the Treatment Centers.

18.     The Marchman Act also provided guidelines for sober homes/recovery residences, which were defined as "a residential dwelling unit, or other form of group housing that is offered or advertised . . . as a residence that provides a peer-supported, alcohol-free, and drug-free living environment."   Fl. Stat. § 397.311(36).

### Payment for Substance Abuse Treatment

19.     Insurance coverage for substance abuse treatment and testing was available through a number of avenues, including federal health care benefits programs like the Federal Employees Health Benefits Program ("FEHBP")), health plans sponsored by private employers (including the

5

National Railroad Passenger Corporation ("Amtrak") employee health care benefit plans), and health plans offered directly by private insurance companies.   Health plans sponsored by private employers are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, while those sponsored by governmental employers and certain others are exempted from ERISA's jurisdiction.

20.     Both ERISA and non-ERISA health benefit plans, including Affordable Care Act plans, were offered or administered by private insurance companies, including Blue Cross/Blue Shield ("BCBS"), Aetna, Cigna Behavioral Health, Cigna Health & Life Insurance Company, United Behavioral Health, and United Health Group.

21.     Journey, Reflections, Smart Lab LLC, Lab #2, Pharmacy #1, and Pharmacy #2 submitted claims for reimbursement to more than forty health benefit plans, including the FEHBP plans, Amtrak's established plans, and private ERISA and non-ERISA health benefit plans (jointly referred to as "the Insurance Plans").

22.     The Insurance Plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

23.     Regardless of the type of Insurance Plan held by a patient, the amount of coverage and terms and conditions of billing and payment were governed by the terms of the patient's insurance documents, and the insurance company administering the plan had the authority, responsibility, and discretion to make coverage determinations and to process and make payments on claims.

24.     The "Florida Patient Brokering Act," made it a felony offense for any person, health care provider, or health care facility, including any state licensed substance abuse service provider,

6

to: "(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; (c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c)."   Fla. Stat. § 817.505.

25.     Florida law also provided that it was "a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge."   Fla. Stat. § 817.234(7)(a).

26.     Under the terms of the insurance policies and consistent with state and federal law, the Insurance Plans were only responsible for claims for services and prescription medications that: (a) were "medically necessary" and actually rendered, (b) were provided and prescribed by a properly licensed service provider, and (c) complied with the terms of the health care plans, including the obligation to pay co-insurance and deductibles.

### Bodily Fluid Testing

27.     Bodily fluid testing could be used to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva.   Urine Analysis or urinalysis ("UA") testing ranged in complexity from screening tests -- also known as point of care ("POC") testing -- which provided instant results, to confirmatory testing, which was sent to a laboratory, for more complex analysis.   Laboratories could also conduct complex analysis on blood and saliva samples.

28.     Like other medical tests, bodily fluid testing could be billed and reimbursed pursuant to the terms of the insurance policy.   The Insurance Plans were only responsible for claims for testing that was "medically necessary," actually performed, prescribed, and conducted by a properly licensed service provider in accordance with state and federal law, and conducted and billed in compliance with the terms of the health care plan, including the obligation to pay co-insurance.

29.     The Insurance Plans provided guidance to service providers, including physicians, substance abuse treatment centers, and laboratories, for the types and frequency of testing that would be reimbursable.   This guidance was based upon policy statements from the American Society of Addiction Medicine ("ASAM"), publications by expert researchers in the area of substance abuse treatment, and policies of federal and state governmental agencies.

### Count 1
### (Conspiracy to Commit Health Care Fraud – 18 U.S.C. § 1349)

30.     Paragraphs 1-29 of the "General Allegations" section of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

31.     From at least as early as December 2015, through in or around December 2016, the exact dates being unknown to the Grand Jury, in Palm Beach and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**ARMAN ABOVYAN**
**and**
**TINA MARIE BARBUTO,**

did knowingly and willfully combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, in connection with the delivery of and payment for health care benefits, items, and services, to execute and attempt to execute, a scheme and artifice to: (a) defraud health care benefit programs, as defined by Title 18, United States Code, Section 24(b); and (b) obtain, by means of materially false and fraudulent pretenses, representations, and promises, any of the money and property owned by, and under the custody and control of, health care benefit programs, as defined by Title 18, United States Code, Section 24(b).

## OBJECT OF THE CONSPIRACY

32.     It was the object of the conspiracy for the defendants to unlawfully enrich themselves and others, by defrauding health care benefit programs and obtaining the money of health care benefit programs to which the members of the conspiracy were not entitled.

## MANNER AND MEANS OF THE CONSPIRACY

33.     The manner and means by which the defendants sought to accomplish the object of the conspiracy included, among other things, the following:

a.     Co-conspirators opened and established relationships with recovery residences, commonly referred to as "sober homes," that were purportedly in the business of providing safe and drug-free residences for individuals suffering from drug and alcohol addiction.

9

b.      To obtain residents for the sober homes, co-conspirators provided kickbacks and bribes, in the form of free or reduced rent and other benefits to individuals with insurance who agreed to reside at the sober homes, attend drug treatment, and submit to regular and random drug testing (typically three or more times per week), so that members of the conspiracy could bill the testing and treatment to the residents' Insurance Plans.

c.      Although the sober homes were purportedly drug-free residences, co-conspirators permitted the residents to continue using drugs as long as they attended treatment and submitted to drug testing.   In some instances, co-conspirator Kenneth Chatman, a/k/a "Kenny," and other co-conspirators provided residents with drugs.

d.      Co-conspirators Kenneth Chatman, a/k/a "Kenny," Stefan Gatt, and Laura Chatman, and persons known and unknown to the Grand Jury established substance abuse treatment centers, including Journey and Reflections, which were purportedly in the business of providing effective clinical treatment services for persons suffering from alcohol and drug addiction.

e.      Defendant **TINA MARIE BARBUTO** and co-conspirators Kenneth Chatman, a/k/a "Kenny," Laura Chatman, Stefan Gatt, Barry Gregory, and other co-conspirators created and signed documents to conceal the fact that Kenneth Chatman, a/k/a "Kenny," had an ownership and managerial interest in Journey and Reflections because Kenneth Chatman, a/k/a "Kenny" could not lawfully own or operate a substance abuse treatment center licensed by the State of Florida.

f.      Defendant **TINA MARIE BARBUTO** prepared licensing and accrediting documents and co-conspirator Laura Chatman signed and submitted documents to DCF and appeared at Journey and Reflections for inspections by DCF and other accrediting agencies in

order to conceal co-conspirator Kenneth Chatman's ownership and management of Journey and Reflections.

g.    Co-conspirators who owned, operated and managed sober homes referred the residents with insurance to become patients at Journey and Reflections, in return for kickbacks and bribes from co-conspirator Kenneth Chatman, a/k/a "Kenny," which kickbacks and bribes were often disguised as marketing fees, consulting fees, commissions, and case management fees.

h.    Co-conspirators, including Kenneth Chatman, a/k/a "Kenny," directly and indirectly solicited and received kickbacks and bribes from co-conspirator clinical laboratory agents and employees for referring the bodily fluid testing related to patients of Journey and Reflections to the clinical laboratories that, in turn, would bill the patients' Insurance Plans. These kickbacks and bribes were sometimes disguised as gifts, investments, and dividends.

i.    Members of the conspiracy required the sober home residents to travel to Journey and Reflections approximately three times per week to attend purported substance abuse treatment sessions and to submit to drug testing that could be billed to the Insurance Plans by Journey, Reflections, Smart Lab LLC, and Lab #2.   To this end, Journey and Reflections sent vans, often operated by members of the conspiracy, to the sober homes to transport the residents to Journey and Reflections.

j.    In many instances, sober home residents were not present when the van arrived and therefore did not attend the purported treatment sessions at Journey and Reflections and did not provide bodily fluid samples for drug testing.   On such occasions, employees of Journey and Reflections and other persons known and unknown to the Grand Jury forged patients' signatures on sign-in sheets to make it appear as though absent patients had attended treatment and submitted bodily fluid samples.

11

k.      Co-conspirators would obtain urine and saliva samples from employees of Journey and Reflections and from other patients, and submit these samples for testing as if they had been obtained from the absent patients.

l.      Defendant **TINA MARIE BARBUTO** and co-conspirators caused confirmatory testing to be performed and testing and substance abuse treatment to be billed for patients knowing that the patients had been discharged or had left the treatment centers and were no longer receiving treatment or submitting bodily fluid samples for testing at the treatment centers.

m.      Co-conspirator Kenneth Chatman, a/k/a "Kenny," with the assistance of defendant **TINA MARIE BARBUTO**, hired doctors, including defendant **ARMAN ABOVYAN**, to serve as medical directors of his treatment centers.   Co-conspirators Kenneth Chatman, a/k/a "Kenny," and Laura Chatman paid the medical directors, including defendant **ARMAN ABOVYAN**, a monthly salary and in return the medical directors ordered drug testing for the treatment center patients, regardless of whether such testing was medically necessary or conducted and billed in compliance with the terms of the Insurance Plans.   When a medical director informed defendant **TINA MARIE BARBUTO** that he would not prescribe the medically unnecessary lab testing that would maximize kickbacks to co-conspirator Kenneth Chatman, CHATMAN, with the assistance of defendant **TINA MARIE BARBUTO,** fired the medical director.

n.      Thereafter, defendant **TINA MARIE BARBUTO** assisted co-conspirator Kenneth Chatman, a/k/a "Kenny," in hiring defendant **ARMAN ABOVYAN** to serve as medical director and to prescribe the medically unnecessary lab testing and to prescribe Buprenorphine for the detoxification and treatment of persons suffering from opioid addiction knowing that defendant

12

**ARMAN ABOVYAN** did not have the proper certifications from SAMHSA or the DEA to prescribe those medications.

            o.     Defendant **ARMAN ABOVYAN** and co-conspirators ordered and caused the ordering of expensive urine and saliva drug screens that were not medically necessary or reimbursable, in that (i) the confirmatory tests were duplicative because patients' urine and saliva samples were sent to multiple laboratories for the same tests; (ii) the test results were not timely reviewed or used by a doctor or treatment professional in developing or modifying the patients' treatment plans; (iii) tests were not ordered until after the tests were performed; and (iv) the tests were not determined to be medically necessary on an individualized basis by a doctor prior to being performed.

            p.     Defendant **ARMAN ABOVYAN** electronically signed hundreds of lab test results for Reflections' patients falsely certifying that he had reviewed the results and the statements of medical necessity for the lab testing despite the fact that the results were weeks or months old and many of the patients had already left the Treatment Centers.

            q.     Defendants **ARMAN ABOVYAN** and **TINA MARIE BARBUTO** and other co-conspirators provided after-the-fact statements of medical necessity to clinical laboratories for bodily fluid testing that had not been properly prescribed or authorized when performed so that Smart Lab and Lab #2 could bill the Insurance Plans.

            r.     Despite his lack of certifications from SAMHSA and DEA, defendant **ARMAN ABOVYAN** prescribed controlled substances, including Buprenorphine, to patients at Journey and Reflections, and provided blank, pre-signed prescriptions to other individuals who were not certified by SAMHSA and DEA to prescribe Buprenorphine, that those individuals used to prescribe Buprenorphine and other controlled substances without those patients being examined

by defendant **ARMAN ABOVYAN**.   Even after defendant **ARMAN ABOVYAN** obtained a certification to prescribe Buprenorphine, he failed to comply with federal and state regulations regarding the proper prescribing of Buprenorphine and he continued to provide blank, pre-signed prescriptions to other unlicensed individuals that were used to dispense Buprenorphine and other controlled substances.

s.       Defendant **TINA MARIE BARBUTO** and co-conspirators, including Kenneth Chatman, a/k/a "Kenny," withheld Buprenorphine from patients for whom the drug had been prescribed, causing those patients to suffer from the physical and psychological effects of withdrawal, and retained Buprenorphine that had been prescribed to patients who voluntarily or involuntarily left Reflections.

t.       Defendant **TINA MARIE BARBUTO** and co-conspirators, including Kenneth Chatman, a/k/a "Kenny," provided Buprenorphine that had been taken from patients' prescriptions to give to other individuals who had not been prescribed Buprenorphine.

u.       Members of the conspiracy elected not to collect mandatory co-pays, deductibles, and other co-insurance from patients that could cause patients to be unable or unwilling to submit to testing and treatment so that the members of the conspiracy could, instead, collect the much larger reimbursements from the Insurance Plans.   The members of the conspiracy did not inform the Insurance Plans that they were not collecting the co-insurance payments as required by the terms of the Insurance Plans.

v.       Defendants **ARMAN ABOVYAN** and **TINA MARIE BARBUTO** and co-conspirators prepared and caused the preparation and submission to the Insurance Plans of fraudulent insurance claim forms, that is, (i) the claims falsely stated that the testing and treatment had been medically necessary and actually rendered when, in truth and in fact, some of the claimed

14

testing and treatment had not been necessary or performed; (ii) the claims failed to disclose that the patients had not been asked to pay their co-payments and deductibles; and (iii) the claims failed to disclose that Journey and Reflections had obtained their licenses through false statements and omissions.

   w.  Defendant **TINA MARIE BARBUTO** and co-conspirators directly and indirectly maintained control over residents by threatening violence and confiscating their belongings, car keys, telephones, medications, and food stamps, in order to maintain the ability to continue billing their Insurance Plans.

   x.  Defendant **TINA MARIE BARBUTO** and co-conspirators required patients and parents to sign or submit false statements disclaiming their complaints of mistreatment and fraud at Journey and Reflections in order to receive their belongings, medication, and information regarding the whereabouts of their children.

   y.  After learning that Journey and Reflections were under investigation, defendant **TINA MARIE BARBUTO** and co-conspirators removed patient records and belongings, including documents containing confidential substance abuse treatment information and patient identifying information, and placed them in a storage space rented by defendant **TINA MARIE BARBUTO** to keep them from being discovered by law enforcement.

  All in violation of Title 18, United States Code, Section 1349.

## COUNT 2

From at least as early as July 20, 2016, the exact date being unknown to the Grand Jury, through on or about December 30, 2016, in Palm Beach and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**ARMAN ABOVYAN**
**and**
**TINA MARIE BARBUTO,**

did knowingly and willfully combine, conspire, confederate, and agree with each other and with Kenneth Chatman and other persons known and unknown to the Grand Jury, to distribute, possess with intent to distribute, and dispense outside the scope of professional practice and not for a legitimate medical purpose, a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

Pursuant to Title 21, United States Code, Section 841(b)(1)(C), it is further alleged that this violation involved a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of amphetamine.

Pursuant to Title 21, United States Code, Section 841(b)(1)(C), it is further alleged that this violation involved a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of lisdexamfetamine.

Pursuant to Title 21, United States Code, Section 841(b)(1)(C), it is further alleged that this violation involved a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of dextroamphetamine.

Pursuant to Title 21, United States Code, Section 841(b)(1)(E), it is further alleged that this violation involved a Schedule III controlled substance, that is, a mixture and substance containing a detectable amount of buprenorphine.

16

Pursuant to Title 21, United States Code, Section 841(b)(2), it is further alleged that this violation involved a Schedule IV controlled substance, that is, a mixture and substance containing a detectable amount of clonazepam.

Pursuant to Title 21, United States Code, Section 841(b)(2), it is further alleged that this violation involved a Schedule IV controlled substance, that is, a mixture and substance containing a detectable amount of lorazepam.

Pursuant to Title 21, United States Code, Section 841(b)(2), it is further alleged that this violation involved a Schedule IV controlled substance, that is, a mixture and substance containing a detectable amount of phenobarbital.

## COUNT 3

On or about July 20, 2016, in Broward County, in the Southern District of Florida, the defendants,

**ARMAN ABOVYAN**
**and**
**TINA MARIE BARBUTO,**

did knowingly and intentionally distribute and dispense outside the scope of professional practice and not for a legitimate medical purpose, a controlled substance to Patient #1; in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

Pursuant to Title 21, United States Code, Section 841(b)(1)(E), it is further alleged that this violation involved a Schedule III controlled substance, that is, a mixture and substance containing a detectable amount of buprenorphine.

17

## COUNT 4

On or about July 25, 2016, in Broward County, in the Southern District of Florida, the defendants,

**ARMAN ABOVYAN**
**and**
**TINA MARIE BARBUTO,**

did knowingly and intentionally distribute and dispense outside the scope of professional practice and not for a legitimate medical purpose, a controlled substance to Patient #2; in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

Pursuant to Title 21, United States Code, Section 841(b)(1)(E), it is further alleged that this violation involved a Schedule III controlled substance, that is, a mixture and substance containing a detectable amount of buprenorphine.

## COUNT 5

On or about July 25, 2016, in Broward County, in the Southern District of Florida, the defendants,

**ARMAN ABOVYAN**
**and**
**TINA MARIE BARBUTO,**

did knowingly and intentionally distribute and dispense outside the scope of professional practice and not for a legitimate medical purpose, a controlled substance to Patient #3; in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

Pursuant to Title 21, United States Code, Section 841(b)(1)(E), it is further alleged that this violation involved a Schedule III controlled substance, that is, a mixture and substance containing a detectable amount of buprenorphine.

## COUNT 6

On or about July 27, 2016, in Broward County, in the Southern District of Florida, the defendants,

**ARMAN ABOVYAN**
**and**
**TINA MARIE BARBUTO,**

did knowingly and intentionally distribute and dispense outside the scope of professional practice and not for a legitimate medical purpose, a controlled substance to Patient #4; in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

Pursuant to Title 21, United States Code, Section 841(b)(1)(E), it is further alleged that this violation involved a Schedule III controlled substance, that is, a mixture and substance containing a detectable amount of buprenorphine.

## COUNT 7

On or about August 3, 2016, in Broward County, in the Southern District of Florida, the defendants,

**ARMAN ABOVYAN**
**and**
**TINA MARIE BARBUTO,**

did knowingly and intentionally distribute and dispense outside the scope of professional practice and not for a legitimate medical purpose, a controlled substance to Patient #5; in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

Pursuant to Title 21, United States Code, Section 841(b)(1)(E), it is further alleged that this violation involved a Schedule III controlled substance, that is, a mixture and substance containing a detectable amount of buprenorphine.

19

## COUNT 8

On or about August 29, 2016, in Broward County, in the Southern District of Florida, the defendants,

**ARMAN ABOVYAN
and
TINA MARIE BARBUTO,**

did knowingly and intentionally distribute and dispense outside the scope of professional practice and not for a legitimate medical purpose, a controlled substance to Patient #2; in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

Pursuant to Title 21, United States Code, Section 841(b)(1)(E), it is further alleged that this violation involved a Schedule III controlled substance, that is, a mixture and substance containing a detectable amount of buprenorphine.

## COUNT 9

On or about August 31, 2016, in Broward County, in the Southern District of Florida, the defendants,

**ARMAN ABOVYAN
and
TINA MARIE BARBUTO,**

did knowingly and intentionally distribute and dispense outside the scope of professional practice and not for a legitimate medical purpose, a controlled substance to Patient #6; in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

Pursuant to Title 21, United States Code, Section 841(b)(1)(E), it is further alleged that this violation involved a Schedule III controlled substance, that is, a mixture and substance containing a detectable amount of buprenorphine.

## COUNT 10

On or about December 30, 2016, in Broward County, in the Southern District of Florida, the defendants,

**ARMAN ABOVYAN
and
TINA MARIE BARBUTO,**

did knowingly and intentionally possess with intent to distribute a controlled substance; in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

Pursuant to Title 21, United States Code, Section 841(b)(1)(C), it is further alleged that this violation involved a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of amphetamine.

Pursuant to Title 21, United States Code, Section 841(b)(1)(C), it is further alleged that this violation involved a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of lisdexamfetamine.

Pursuant to Title 21, United States Code, Section 841(b)(1)(C), it is further alleged that this violation involved a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of dextroamphetamine.

Pursuant to Title 21, United States Code, Section 841(b)(1)(E), it is further alleged that this violation involved a Schedule III controlled substance, that is, a mixture and substance containing a detectable amount of buprenorphine.

Pursuant to Title 21, United States Code, Section 841(b)(2), it is further alleged that this violation involved a Schedule IV controlled substance, that is, a mixture and substance containing a detectable amount of clonazepam.

21

Pursuant to Title 21, United States Code, Section 841(b)(2), it is further alleged that this violation involved a Schedule IV controlled substance, that is, a mixture and substance containing a detectable amount of lorazepam.

Pursuant to Title 21, United States Code, Section 841(b)(2), it is further alleged that this violation involved a Schedule IV controlled substance, that is, a mixture and substance containing a detectable amount of phenobarbital.

## COUNT 11

On or about March 11, 2016, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

### TINA MARIE BARBUTO,

did corruptly obstruct, influence, impede, and attempt to obstruct, influence, and impede an official proceeding, that is, a grand jury proceeding and a trial; in violation of Title 18, United States Code, Sections 1512(c)(2) and 2.

## COUNT 12

From in or around September 2016, the exact date being unknown to the Grand Jury, through in or around December 30, 2016, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

### TINA MARIE BARBUTO,

did corruptly conceal and attempt to conceal a record, document, and other object, that is, medical files, personal belongings of patients, and medications, with the intent to impair their availability for use in an official proceeding, that is, a grand jury proceeding and a trial; in violation of Title 18, United States Code, Sections 1512(c)(1) and 2.

## CRIMINAL FORFEITURE ALLEGATIONS

1.      The allegations of this Superseding Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging criminal forfeiture to the United States of America of certain property in which the defendants, **ARMAN ABOVYAN and TINA MARIE BARBUTO,** have an interest.

2.      Upon conviction of the violation alleged in Count 1 of this Superseding Indictment, the defendants, **ARMAN ABOVYAN and TINA MARIE BARBUTO,** shall forfeit to the United States all property, real and personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.   Pursuant to Title 18, United States Code, Section 982(a)(7), Title 28, United States Code, Section 2461, Title 18, United States Code, Section 981(a)(1)(C), and Title 21, United States Code, Section 853.

3.      If the property described above as being subject to forfeiture, as a result of any act or omission of the defendants,

     (a)      cannot be located upon the exercise of due diligence;

     (b)      has been transferred or sold to, or deposited with a third person;

     (c)      has been placed beyond the jurisdiction of the Court;

     (d)      has been substantially diminished in value; or

     (e)      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

All pursuant to Title 28, United States Code, Section 2461, Title 18, United States Code,

Section 981(a)(1)(C), and Title 21, United States Code, Section 853.

4.    Upon conviction of any of the violations alleged in Counts 2 through 10 of this Superseding Indictment, the defendants, **ARMAN ABOVYAN and TINA MARIE BARBUTO,** shall forfeit to the United States of America any property constituting, or derived from, any proceeds the defendants obtained, directly or indirectly, as the result of such violation, and any property that was used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

All pursuant to Title 21, United States Code, Section 853.

A TRUE BILL.

'FOREPERSON

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

A. MARIE VILLAFAÑA
ASSISTANT UNITED STATES ATTORNEY

ALEXANDRA CHASE
ASSISTANT UNITED STATES ATTORNEY

24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| UNITED STATES OF AMERICA | CASE NO. _____ |
|---|---|

vs.

**CERTIFICATE OF TRIAL ATTORNEY***

ARMAN ABOVYAN &
TINA MARIE BARBUTO,
        **Defendant.**
_____/   **Superseding Case Information:**

**Court Division**: (Select One)

Miami _____  Key West _____
FTL _____  WPB __X__  FTP ___

New Defendant(s)        YES _____     NO _____
Number of New Defendants
Total number of counts _____

I do hereby certify that:

1.    I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.    I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.    Interpreter:     (Yes or No)     __No__
      List language and/or dialect _____

4.    This case will take   __10-15__ days for the parties to try.

5.    Please check appropriate category and type of offense listed below:
      (Check only one)                                      (Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I | 0 to 5 days | | Petty | | |
| II | 6 to 10 days | | Minor | | |
| III | 11 to 20 days | X | Misdem. | | |
| IV | 21 to 60 days | | Felony | X | |
| V | 61 days and over | | | | |

6.    Has this case been previously filed in this District Court? (Yes or No) __Yes__
If yes:
Judge: __Middlebrooks__              Case No. 18-CR-80122-Middlebrooks/Brannon(s)
(Attach copy of dispositive order)
Has a complaint been filed in this matter? (Yes or No) __No__
If yes:    Magistrate Case No. _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the
District of _____

Is this a potential death penalty case? (Yes or No) ____Yes      __X__ No

7.    Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?      _____ Yes    __X__ No

8.    Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?      _____ Yes    __X__ No

 

_____
A. Marie Villafaña
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0018255

*Penalty Sheet(s) attached                                         REV.9/11/07

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**  ARMAN ABOVYAN

**Case No:**  **18-80122-CR-MIDDLEBROOKS/BRANNON(s)**

Count # 1:
Conspiracy to Commit Health Care Fraud

Title 18, United States Code, Section 1349

**\*Max. Penalty:**   10 Years' Imprisonment; Fine of $250,000 or twice the gross loss or twice the gross gain; Supervised Release of 3 Years to Life; $100 Special Assessment.

Count # 2:
Conspiracy to Possess, Distribute, and Dispense Controlled Substances (Schedule II, III, & IV)

Title 21, United States Code, Section 846

**\*Max. Penalty:**   20 Years' Imprisonment; $1,000,000 fine; Supervised Release of 3 Years to Life; $100 Special Assessment.

Counts # 3-9:
Unlawful Dispensing of Controlled Substances (Schedule III)

Title 21, United States Code, Section 841(a)(1)

**\*Max. Penalty:**   10 Years' Imprisonment; $500,000 fine; Supervised Release of 2 Years to Life; $100 Special Assessment.

Count # 10:
Possession with Intent to Distribute Controlled Substances (Schedule II, III, & IV)

Title 21, United States Code, Section 841(a)(1)

**\*Max. Penalty:**   20 Years' Imprisonment; $1,000,000 fine; Supervised Release of 3 Years to Life; $100 Special Assessment.

  **\*Refers only to possible term of incarceration, fines, and special assessments.   Does not include possible restitution, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**   TINA MARIE BARBUTO

**Case No:   18-80122-CR-MIDDLEBROOKS/BRANNON(s)**

Count # 1:
Conspiracy to Commit Health Care Fraud

Title 18, United States Code, Section 1349

**\*Max. Penalty:**   10 Years' Imprisonment; Fine of $250,000 or twice the gross loss or twice the gross gain; Supervised Release of 3 Years to Life; $100 Special Assessment.

Count # 2:
Conspiracy to Possess, Distribute, and Dispense Controlled Substances (Schedule II, III, & IV)

Title 21, United States Code, Section 846

**\*Max. Penalty:**   20 Years' Imprisonment; $1,000,000 fine; Supervised Release of 3 Years to Life; $100 Special Assessment.

Counts # 3-9:
Unlawful Dispensing of Controlled Substances (Schedule III)

Title 21, United States Code, Section 841(a)(1)

**\*Max. Penalty:**   10 Years' Imprisonment; $500,000 fine; Supervised Release of 2 Years to Life; $100 Special Assessment.

Count # 10:
Possession with Intent to Distribute Controlled Substances (Schedule II, III, & IV)

Title 21, United States Code, Section 841(a)(1)

**\*Max. Penalty:**   20 Years' Imprisonment; $1,000,000 fine; Supervised Release of 3 Years to Life; $100 Special Assessment.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET (page 2)

**Defendant's Name:**   TINA MARIE BARBUTO

**Case No:**   18-80122-CR-MIDDLEBROOKS/BRANNON(s)

Counts # 11-12:
Obstruction of Justice

Title 18, United States Code, Section 1512(c)

**\*Max. Penalty:**   20 Years' Imprisonment; $250,000 fine; Supervised Release of 3 Years; $100 Special Assessment.

   **\*Refers only to possible term of incarceration, fines, and special assessments.   Does not include possible restitution, parole terms, or forfeitures that may be applicable.**