# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.: 18-80122-CR-MIDDLEBROOKS/BRANNON

UNITED STATES OF AMERICA,

    *Plaintiff*,

vs.

TINA MARIE BARBUTO,

    *Defendant.*

_____/

## MOTION FOR COMPASSIONATE RELEASE AND REQEUST FOR IMMEDIATE RELEASE IN LIGHT OF COVID-19 EMERGENCY

Defendant Tina Marie Barbuto, by and through the undersigned counsel, respectfully files this motion and asks the Court to exercise its authority under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018, and order that Ms. Barbuto be immediately released from the Bureau of Prisons in light of the emergency conditions created by the COVID-19 pandemic and Ms. Barbuto's heightened susceptibility to seriousness illness or death as a result of the disease.

**I.    Procedural History**

1. Ms. Barbuto pled guilty to conspiracy to commit health care fraud.

2. On January 25, 2019, the Court imposed a sentence of 36 months. [D.E. 248].

3. According to Ms. Barbuto's case manager, she is set to be released in July 2020.

4. Ms. Barbuto has been a model prisoner. She participated and successfully completed the RDAP program. She participated and successfully completed multiple courses related to the First Step Act. She has also helped other women in the prison complete programs.

5. While Ms. Barbuto has tried to make the best of her time in prison, it has not been an easy time. Ms. Barbuto has been under a great deal of stress and anxiety in prison. Because of Ms. Barbuto's mental health issues, which the Court is aware of, the anxiety has resulted in stress eating. Ms. Barbuto quickly gained 50 lbs. She was recently diagnosed with hypertension and placed on medication. In addition to the hypertension, Ms. Barbuto has polyps in her nose that remain untreated. These conditions place her at a higher risk of developing serious illness should he contract COVID-19.

6. On March 23, 2020, Ms. Barbuto submitted a request to the Warden at FPC Alderson requesting for a recommendation for home confinement. Last week, Ms. Barbuto was informed by her case manager that the request would not be granted. However, neither Ms. Barbuto nor undersigned counsel has received anything in writing. Given the urgent circumstances here, Ms. Barbuto is seeking relief from this Court.

8. If released, Ms. Barbuto's sister, Rose Linda Barbuto will drive to pick up Ms. Barbuto. Rose Linda Barbuto has access to Protective Personal Equipment, including masks and gloves. She will wear a mask and gloves for the drive. She will bring a second set for Ms. Barbuto to wear on the ride back. Upon arrival in Syracuse, NY, Ms. Barbuto will reside with her sister. The home has four bedrooms. One bedroom and bathroom will be designated for Ms. Barbuto in order for her to self quarantine for 14 days. Rose Linda Barbuto's home has already been approved for placement by the Bureau of Prisons. *See* Letter from Rose Linda Barbuto attached hereto as Exhibit 1.

10. Given these circumstances, Ms. Barbuto asks this Court to reduce his sentence to enter an order releasing Ms. Barbuto to serve the remainder of his custodial sentence on home-detention, and ordering his immediate release from BOP custody.

**II.   Under the First Step Act, this Court has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify Ms. Barbuto's Sentence and Release Her to Home Confinement.**

The First Step Act ("FSA") expressly permits Ms. Barbuto to move this Court to reduce her term of imprisonment and seek compassionate release. *See* 18 U.S.C. § 3583(c)(1)(A)(i). Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the

defendant's request, whichever is earlier. *Id.* On March 23, 2020, counsel transmitted Ms. Barbuto's request to the warden of Alderson FPC via email and fax. Although the BOP has yet to provide a written decision, Ms. Barbuto's case manager advised that the request was denied. In light of the urgent nature of this motion, Ms. Barbuto files this motion now.

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." *See, e.g.*, *Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020). However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments. *United States v. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28, 2019); *see also Ebbers*, 2020 WL 91399, at *4. Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

    **A.**    **The Unprecedented Nature of this Emergency Compels the Court to find the Need for Exhaustion Requirement Waived.**

The Court need not and should not wait for Ms. Barbuto to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to Ms. Barbuto. *See generally Washington v. Barr*, 925 F.3d 109, 120–21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.").

Federal courts have found that they can hear applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency. *See United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF Docket No. 642 (D. Mass. Mar. 17, 2020) (granting defendant's emergency motion based on COVID-19); *see also United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of prisoner with cancer). This accords with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes. *See, e.g., Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (*citing Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative exhaustion

5

requirements can be waived if delay would cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)). Those policies were articulated by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749 (1975):

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

422 U.S. at 765.

Conducting an "intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in *Bowen* that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place." 476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); *see also Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J.,

6

concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the impending crisis, the unique exhaustion provision in § 3582(c)(1)(A) places this case squarely within *Bowen*'s holding. Under § 3582(c)(1)(A), exhaustion will "merely [ ] enable [Defendants] to receive the procedure they should have been afforded in the first place"—it will simply advance by what could be a crucial thirty days this Court's consideration of Ms. Barbuto's motion for compassionate release. *Bowen*, 476 U.S. at 484. To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be brought *either* by the "Director of the Bureau of Prisons, *or* upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . ." 18 U.S.C. § 3582(c)(1)(A) (emphasis added). In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear disputes in the absence of exhaustion. *Cf. Booth v. Churner*, 532 U.S. 731, 736 (2001) (failure to exhaust under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained in

federal court because that provision explicitly provides that "*[n]o action shall be brought* with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added)).

Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept through BOP facilities).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days. § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier . . . ." (emphasis added)). With this provision, Congress implicitly recognized that the policies underlying compassionate release are not furthered—and, indeed, actively

frustrated—by excessive deference to bureaucratic process. Congress' concerns about delay are even more pronounced in the current public health crisis.

The policies underlying such requirements would not be furthered by strict adherence in this instance. Giving the BOP time to decide administrative applications for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise." *Salfi*, 422 U.S. at 765. The BOP already has provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release. *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. Thus, it would be futile to force defendants to exhaust their administrative remedies—at the cost of their health and, potentially, their lives.

As discussed below, it is only a matter of time before COVID-19 spreads like wildfire in the prisons. As one Court held on March 19th:

> The Court is glad to hear that there are currently no reported cases of COVID-19 at Maguire, but is unsure what that means if people are not being tested. And, as the [prison's] management plan itself acknowledges, symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. That's why the Bay Area is on lockdown. We don't know who's infected. Accordingly, the government's suggestion that Toledo should wait until there is a confirmed outbreak of COVID-19 in Maguire before seeking release, *see* ECF No. 113 at 6 ("If the situation with respect to COVID-19 at Maguire

9

> changes, Toledo is free to seek reconsideration of the issue at that point."), is impractical. By then it may be too late.

*In the Matter of the Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, at *1, 19- MJ-71055 (MAG) (TSH) (N.D. Cal., Mar. 19, 2020).

With the speed and unpredictability of this pandemic, waiting even 30 days will b. Accordingly, this Court should exercise jurisdiction over Ms. Barbuto's emergency motion for compassionate release and dispense with the BOP requirements under 18 U.S.C. § 3582(c)(1)(A)(i).

### B. "Extraordinary and compelling reasons" warrant a reduction in Ms. Barbuto's sentence.

#### 1. COVID-19 is a public health disaster that threatens vulnerable incarcerated persons like Ms. Barbuto.

The COVID-19 pandemic continues to roil the United States. As of April 20, 2020, the country has 782,987 confirmed positive cases, and approximately 41,777 deaths.[1] COVID-19 is already sweeping through the city's jails and prisons, too. As of April 19, 2020, at least 495 inmates and 308 BOP staff have tested positive for COVID 19.[2] To date, BOP has reported 22 inmate deaths as a result of COVID19.[3] The numbers are likely higher, as testing is limited. *See, e.g.*, *In the Matter of the Extradition of Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020)

---

[1] https://www.worldometers.info/coronavirus/country/us/
[2] http://www.bop.gov/coronavirus
[3] Id.

(expressing concern about the infection rate within BOP facilities given that "people are not being tested").

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. *See* Joseph A. Bick (2007). *Infection Control in Jails and Prisons. Clinical Infectious Diseases* 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.[4] Despite the general lockdown, BOP continues to transport inmates to and from facilities and has confirmed, on March 25, 2020, that it will not stop admitting new inmates.[5] This exacerbates the risk of transmission. Though the BOP emphasizes that it screens inmates before moving them,9[6] as the *Manrique* Court put it: "the

---

[4] *Federal Prison Workers Say Conflicting Orders on Coronavirus Response is Putting Lives at Risk*, CBS News (March 19, 2020), *available at* https://www.cbsnews.com/news/coronavirus-prison-federal-employees-sayconflicting-orders-putting-lives-at-risk-2020-03-19/; Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), *available at* https://www.nytimes.com/2020/03/17/us/coronavirusprisons-jails.html; Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators.'"* NPR (March 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.
[5] Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates: Sources*, ABC News (March 23, 2020), https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416%22;
[6] BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp

11

[BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.[7]

This Court is already aware of the extensive reports of the efforts taken to stem the spread of COVID-19 in jail and prison settings and the inevitable inadequacy of such measures, and we will not belabor those here. *See, e.g.*, Ned Parker at al, *Spread of Coronavirus Cccelerates in U.S. Jails and Prisons*, Reuters, March 29, 2020, available at https://www.reuters.com/article/us-health-coronavirus-usa-inmates-insigh/spread-of-coronavirusaccelerates-in-us-jails-and-prisons-idUSKBN21F0TM.

Decarceration in this context is not only a public health imperative. It is also a humanitarian imperative.

> 2. *Ms. Barbuto's vulnerability to COVID-19 due to her high medical risk is an extraordinary and compelling reason that warrants home confinement.*

Ms. Barbuto is particularly vulnerable to COVID-19, she has a history of heart disease in her family and she was recently diagnosed with hypertension.

---

[7] In fact, according to information the BOP provided to the U.S. Marshals Service, the positive case at MDC Brooklyn came from a new inmate who had left Rikers on March 16, 2020, was brought to MDC Brooklyn that evening, and passed all of MDC Brooklyn's screening tests. He became symptomatic two days later and was sent to Lutheran Hospital for testing, and returned to the MDC Brooklyn to await the results. Between March 16, 2020 and when the positive test result

Additionally, she suffers from polyps in her nose that have been left untreated. These are an "extraordinary and compelling reasons" for her release. *See* Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), *see* Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Ms. Barbuto's high susceptibility to COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the limitations in a prison environment (even a prison medical center) on practicing the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Ms. Barbuto suffers from ailments that have already been identified as "high risk," this Court should find that Ms. Barbuto's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael

Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible."[8] And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

Finally, in the last few days, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers

---

[8] https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf

14

Island.[9] Approximately 1,700 inmates have been released from Los Angeles County Jails,[10] and 1,000 inmates are to be released from New Jersey jails.[11] Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

## III. Granting Relief is consistent with the Policy Statement and the § 3553(a) factors.

When considering a compassionate release request, the Court must also find that a sentence reduction is "consistent with applicable policy statements issued by the [United States] Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The Policy Statement in USSG §1B1.13 suggest that, in determining whether Mr. Rousseau's sentence should be reduced, the Court should first decide whether the defendant presents a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). USSG §1B1.13(2). Ms. Barbuto was convicted of a nonviolent offense and she has been a model prison. Ms. Barbuto poses no risk to any person or the community as a whole. Moreover, Ms. Barbuto is a mere weeks away from her release date.

---

[9]https://www.cnbc.com/2020/03/24/coronavirus-new-york-city-to-release-300-nonviolent-inmates-from-rikersisland.html
[10]https://www.dailynews.com/2020/03/24/l-a-county-releases-1700-inmates-from-jail-early-to-prevent-coronavirusoutbreak-behind-bars/
[11] https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html

The Sentencing Guidelines also instruct the Court to consider the sentencing factors set forth in 18 U.S.C. § 3553(a) when deciding a motion for compassionate release.

Given that Ms. Barbuto suffers from significant health issues that make her exceptionally vulnerable to COVID-19, she asks the Court to grant her motion for compassionate release, allowing her to leave the prison facility before a potentially fatal outbreak of COVID-19 strikes Alderson FPC. There should be little doubt that the current pandemic – involving a highly transmissible and extraordinarily dangerous virus which poses a severe threat of death to a person with Ms. Barbuto's medical profile – constitutes an extraordinary and compelling reason warranting compassionate release.

## IV. Ms. Barbuto Has A Stable Home to Live In, if Released to Home Detention, Where She Will Be Safer and The Public Will Be Safer.

Ms. Barbuto has an excellent and verifiable release plan. She will live in her sister's home. The home has several bedrooms, including a bedroom with an attached bathroom that Ms. Barbuto can use while observing the quarantine protocol for 14 days following release. Ms. Barbuto's sister, Rose Linda Barbuto has agreed to travel to pick her up from prison. Rose Linda Barbuto has access to personal protective equipment (PPE) that can be supplied to Ms. Barbuto for the drive back to Syracuse, New York and until she is beyond any quarantine period.

This environment will be significantly better than Alderson FPC, where despite the BOP's best efforts, Ms. Barbuto is constantly at risk from contamination both from within and without the prison walls, and where access to PPE for inmates is essentially non-existent.

**V.     Conclusion**

For the foregoing reasons, Ms. Barbuto respectfully requests that the Court modify her sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home confinement immediately, and/or direct the BOP to use its authority under 34 U.S.C. § 60541(g) and 18 U.S.C. § 3624(c)(2) to release her immediately.

Alternatively, Ms. Barbuto requests a telephonic hearing as soon as possible.

Undersigned counsel contacted AUSA Alexander Chase regarding relief requested in this motion. As of the time of filing the motion, AUSA Chase advised that the government was evaluating its position on the motion.

Date: April 21, 2020

>Respectfully submitted,
>
>TACHE, BRONIS, CHRISTIANSON AND DESCALZO, P.A.
>150 S.E. 2nd Avenue, Suite 600
>Miami, Florida 33131
>Telephone:  (305) 537-9565
>Facsimile:   (305) 537-9567
>
>By: */s/ Marissel Descalzo*
>       Marissel Descalzo, Esq.

        Florida Bar No. 669318
        mdescalzo@tachebronis.com
        service@tachebronis.com
        *Counsel for Tina Marie Barbuto*

ROBIN ELIANI, PLLC
701 Brickell Avenue; Suite 1550
Miami, Florida 33131
Telephone: 305) 373-4400
Facsimile: (305)728-5139

By: */s/ Robin Kaplan-Eliani*
        Robin Kaplan-Eliani, Esq.
        Florida Bar No. 773751
        Robin@RobinEliani.com
        *Counsel for Tina Marie Barbuto*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing document was served on this 21st day of April, 2020 via CM/ECF.

By: */s/ Marissel Descalzo*
        Marissel Descalzo, Esq.